In our fourth case for this morning, Chavez v. Acting Commissioner Berryhill, I see Mr. Forbes approaching the table, so we'll give you a minute to put your briefcase down and hear from you. My name is Randall Forbes. I represent the disability claimant. I've decided to go old school since I can go back and forth given my age and use paper today rather than my computer. There are a few of us on the court who still use paper too, Mr. Forbes. Thank you, Your Honor. So unlike the preceding three cases, this case is mostly about step five in the numbers. And the key thing about step five is who has the burden, the burden of production, the burden to go forward. So can I ask you, Mr. Forbes, I totally understand the point that you're making, and we've made it in cases about this mechanical, you know, here's a big category and we'll divide it by the number of smaller categories it encompasses and assume equal numbers when there's no data for that at all. That strikes me as a terrible methodology. But in the real world, you know, what kinds of things do you think a vocational expert could say to justify the allocation of jobs, you know, from, I'll call it the Roman numeral one category and which go in capital A, capital B, capital C, and so on up to maybe capital E. What do they say? They say in my practice, I don't see any of the A jobs anymore, but I see a lot of the Bs? What do they say? The VE does not have the burden. The United States government, via the Commissioner of Social Security, has the burden. And so what evidence does the Commissioner go out and try to find? That's the question. I'm just trying to figure out how do we deal with this clumsy data that we seem to have in the system? So whose job is it to make sure that the data's not clumsy? It is not the disability claimant's They don't have the burden at step five. The job is the United States government, who is at the top of the most sophisticated economy in the world, an economy that depends on top-notch economic data. And this problem has been known for a good two decades, and they said they were going to fix it almost ten years ago, and they have not. Our clients, the disability claimants, have the burden on steps one, two, three, and four. If we come in and say we couldn't find the evidence, we don't have the evidence, or the evidence doesn't exist, or the method is unreliable, we lose. On one, two, four? That's correct. Mr. Forbes, can you set the facts of this case aside for a second? Can you hypothesize a case where the application of the equal distribution method would be proper, in your view? Just make one up. Only if a V.E. had extensive knowledge of every single job in the SOC standard of occupational classification category, and could testify that every single one of those jobs a claimant was able to do under the hypothetical or the RFC, and that there are other objective studies out there in relation to these jobs that show that an equal distribution is proper. So in other words, I think what you're saying, I have a very similar question, I'm reluctant for the court to go down a path that seems impossible, but on the other hand, I'll give you an extreme example where maybe you would be able to say job browser, whatever its flaws may be, is a better system than equal distribution. You know, if one job in this 1992 dictionary of occupational titles or terms, whatever it is, relied on using fax modems, and nobody even knows what they are anymore, maybe you would say, well there just aren't any jobs left in that category. That's something that technology just moved on, it's the horse and buggy job, and so we're going to say we're not going to use equal distribution because we can at least rule out one or two jobs that the economy simply doesn't have anymore. It's going to be hard a lot of the time without independent and reliable statistical studies at the level as granular as this seems to need to be. It will be difficult, but we don't have any confidence that the numbers are accurate. I have to tell my clients if they lose, and they say, what about these numbers? And I have to tell them, those are not real numbers, and I hate to use this word given the context today, but I have to tell them they're fake numbers. How does a vocational expert become a vocational expert? Who says, okay, you're a vocational expert, and not? Social Security has some regulations, I believe, and I can tell you most of them have a master's degree and some experience in job placement. In what? Job placement. So they run like employment agencies or something like that, job placement? Yeah, or they're professors. A note about Job Browser Pro or the SkillTran issue. I've repeatedly, over the last three years, asked vocational experts, tell me what the allocation method is, and they say it's proprietary. I say, you can't use a secret method, and because- They say it's proprietary? Yeah, it's got to be meaningfully reviewed by the court. It can't be secret. So if we're talking policy, that's the next round of cases that are coming up. Well, who certifies that they can testify? We have requirements with regard to experts testifying in federal court. How does it ... You qualify as an expert in Social Security? Judge asking questions about their education and job experience. That's it? Pretty much. Then they ask if we have objections. Most of the time, claimant's attorneys don't object to the- I can understand it because this whole thing is based on, as you point out, not much. Well, I'm not going to disagree with you, Your Honor. So I think your point ... I want to make sure I understand your answer to the, can you come up with a hypothetical. I think your point is, and don't let me put words in your mouth, okay? I think your point is, I'm not asking you to just wholesale get rid of the equal distribution method. It might be a starting point. But it's at that point that the vocational expert has to pick it up and articulate, based upon some knowledge of the applicable labor market, the employment market, why jobs sufficiently exist in a particular category. Is that a fair summary? Almost. They can't just say, based on my experience, or talking to others, like was done in this case. They've really got to point to objective studies. For example, let's say a university did an objective study on standard occupational classification areas, such and such. And there was data, maybe. One other point, and then I'll sit down, reserve whatever's left. And that is, oh, this case can be decided on the big major policy ground, which will put claimants all over the country, or at least in this circuit, in the driver's seat. But it will also provide Social Security, finally, an incentive in conjunction with the Bureau of the Department of Labor to get this thing cleaned up. This case can also be decided for the claimant on a very narrow ground. The judge, I don't think, made any reliability findings whatsoever. The judge also misstated which methods the vocational expert said were inaccurate. The vocational expert said that Job Browser Pro was inaccurate, and that the one he used was inaccurate. And so we have an acknowledgment of two inaccurate methods here, and no finding of reliability. So thank you, Your Honor. All right. Thank you, Mr. Forbes. Mr. Denke. May it please the court, Joshua Denke for the appellee. In this case, the ALJ reasonably did investigate vocational expert's methodology in coming up with job estimates, job numbers. How did that happen? We have this equal distribution method, and we have a conclusory statement from the vocational expert saying that he doesn't like Job Browser Pro because he thinks the numbers are too low. But he doesn't explain that at all. And I have to say, coming at it from the outside, as this court has said in the past, again, to take my simple solution, if there's a broad category from the Bureau of Labor Statistics and we know that it encompasses five jobs, there's no reason at all to think that they're going to be 20 percent, 20 percent, 20 percent, 20 percent, 20 percent. It's just that there's no reason. And if the burden, as Mr. Forbes accurately says, is on the commissioner at step five, I mean, you've won all these other cases, you've put the burden on the applicant, but now you're at step five. I would think that you could start with local experience to justify what that percentage division is. If a vocational expert's been running an employment agency in northern Indiana for a few years, they may say, you know, we used to have a lot of jobs in the steelmaking industry, but we don't really have those jobs anymore. But what we do have is these other jobs. And maybe you could come up with something better than just, can you divide by five? I mean, that just doesn't mean anything. Well, Your Honor, the vocational expert actually did give a little bit more here. The vocational expert said the other primary methodology, in his expert opinion, did result in lower numbers. That's what I just said. I don't think that's really more. I'm sorry, Your Honor, I was going to get to that. What he said is, he brought up an example of one of the three jobs he raised. He said, Job Browser Pro says that there's 800 of the, I think it was the bench assembly jobs. 800 nationwide. Vocational expert said, in my experience, that is too low of a number. So in essence, that vocational expert was relying on- But he finds one number, which frankly, I'm not even sure he's right about that, because my guess is a huge number of bench assembler jobs are now done by robots. So I really don't know. I mean, I'm not making a judgment about the 800, but to go from 800 is too low, to dividing by five, more or less, to an equal distribution assumption. You're positing that there are two and only two options, one, equal distribution, two, job browser plus. And I'm suggesting that there must be at least a third one, which is local experience. That's why you hire these people. They're supposed to come in and tell you something about the actual jobs. First of all, in the region, perhaps even all the way out to the country, there's literature. And so I think it's a false choice if you say it's just equal distribution versus job browser plus. Well, and Your Honor, the agency is not saying that there are just those two choices. But you just did. The independent vocational expert is saying that. This is not an agency employee. But he's not right. That's an absurd statement. Your Honor, the expert was basing it, is taking those methods, this one in particular is taking the equal distribution method and applying it. I mean, I could get up there and say I'm a vocational expert and do that, and I've never run an employment agency. He's not applying his, I mean, I'm thinking as Judge Kaney was, Rule 702, which I know doesn't apply directly, but it doesn't mean that there are zero standards for these people. He's not applying his expertise to the problem in front of him, which is one of the critical things that you have an expert to do. We would argue that he is by relying on that experience, by relying on other vocational experts. How can you say experience, though? Because we have the transcript of his testimony, right? Yes. And on page 689, I'll let you grab it. You got it there? Yes. On page 689, he makes the statement, I just think it's almost logical that there are more bench assemblers in the national economy than 800. He's not, at least in the transcript, he's not drawing upon experience and talking about some particular attribute of a labor market and saying this is why 800 is too low and it's closer to whatever number he advances. When he discussed that specific example, he didn't necessarily say I have placed bench assemblers or something to that. No. He just says, I just think it's almost logical, and that, talk about seated the pants, I don't know where he gets that from. We don't even know what a bench assembler is. Well, we have the dictionary of occupational titles. Those are outdated. Right. In this case, we're dealing with three occupations that the appellant has not even argued are somehow obsolete or anything of that nature. We see that, this court sees that argument a lot, and sometimes that might have- Well, they ought to see it a lot. And in this case, these three jobs, I mean, we're talking about law- I mean, we see these cases on appeal. This whole thing, this whole idea of vocational experts seems to me to be ridiculous. There's no basis. They have no educational qualifications. I've never seen anything that says, okay, you qualify as a vocational expert because you were what? Who knows what? Well, they, I mean, the resumes are part of the record. Appellants do get a chance to question them about their qualifications. I mean- Mr. Denke, can I ask you another question? Yes. Can you take a look at page 24 of 24, right before the page of the signature block of the ALJ? Of the ALJ's decision? Yeah. In the blue brief. Right. Oh, in one of the briefs or in the decision? Well, or- It's the ALJ's opinion. Just look at the ALJ opinion. Okay. Got you. Thank you. Okay. What really concerns me is the only language in the entire opinion that seems to speak to the reliability of the equal distribution method is in that first full paragraph on page 24. And what I worry about is there's nothing there that articulates why the method is reliable. And I'm concerned that the analysis is one that effectively shifts the burden to the claimant to explain why it's not. Well, I- I mean, what can you point us to? That's all we have. Right, Your Honor. And the ALJ cites the vocational expert's testimony. The expert explained that there is no perfect system. There is no- He doesn't say that, though. He just says the opinion is accepted and it is not contradicted. Right. But earlier, the expert explains that on page 23 of 24, the ALJ states that he, the vocational expert, acknowledged that no one has gone out and counted the exact numbers and the numbers are collected through surveys. And the vocational expert also explained in his testimony- That doesn't mean the method's reliable. Right. It's an estimate. It is an imperfect method. There is no- there's no argument about that here. But this Court has found that imperfection does not necessarily mean that cases should be remanded, such as in the Liskewitz case. But it's like astrology. I mean, that's a method, too, but we probably wouldn't buy it. It's an estimate. And it is- But if you don't know what a bench assembler is, how- does any of this make any sense? Well, again, we're dealing with jobs including not just bench assembler, but also laundry worker. I don't think there's a lot of- A laundry worker. Right. What does a laundry worker do? Does the laundry. For things like hotels and- What if they work in a laundry? If they- I'm sorry? As opposed to working in a hotel. Right, right. It could- it can fill a number of different employers there. And so what we have here- again, I'd point this Court to the Liskewitz case, in which in that case the vocational expert was unable to come up with exactly how many of the jobs were part-time as opposed to full-time. And this Court said- recognized that that information doesn't exist. They weren't going to hold vocational experts and the agency to an impossible standard. And in some of the cases that appellant cited- But I keep pushing back on that. I don't see why it's impossible. If somebody is actually a person with the experience or the academic background to be a vocational expert, to say that at least within the scope of my expertise, you know, 70% or full-time or whatever they say. Otherwise, you know, we might as well just go grab people off the Federal Plaza and say, you know, hey, why don't you be a vocational expert today? The expert explained in this case that even, you know, appellant wants them to have based it on some sort of survey by an institution or a university of some sort. We're not sure what that is. This expert even explained the problem with surveys in his testimony, that that's not based on perfect data. Briefly. I mean, and he made it sound as though the only thing he could do was either do equal distribution or do job pro, and I am saying that that is simply not the case. Well, and I would point this out to this Court as well, that, again, there has been concern about this methodology in previous cases. That's why it's not new to the Commissioner. It's a little frustrating to see no change. Right. And, but the Court has not overturned on this basis before. It even noted in the Allora case, it's cited to a Second Circuit case, Brault, and in Brault it also expressed the same concerns, yet it's still found in favor of the agency. The system is not perfect, but this Court has found that it does not have to be perfect in order to be deemed reliable. Okay. Thank you. Thank you very much. Mr. Forbes, anything further? I think you have about half a minute, but I'll let you have a whole minute if you need it. Thank you. The Brault case was affirmed, but the Allora case, which was my case, was remanded on other reasons, so the Court at that time did not need to go into this. The government has the burden. The government has the ability to prepare and produce evidence, and it's almost black water law in McCormick, I believe. I can't cite it. I haven't read it in 30 years, but I know it's in there that who has the burden loses. We should win this case. Thank you, Your Honor. All right. Thank you very much, Mr. Forbes. Thank you, Mr. Jenke. We will take the case under advisement.